IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

    Plaintiff                          CIVIL ACTION NO.

v.                                     13-1414

CITY OF PHILADELPHIA, ET AL..,      JURY TRIAL DEMANDED

    Defendant

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS MOTION TO AMEND COMPLAINT TO ADD COMMISIONER OF PRISONS

Pursuant to Federal Rule 15(a), Fed.R.Civ.P, Plaintiff seek Court's leave to amended complaint to add heretofore identified defendant Commissioner of Prisons, Louis Giorla, listed in initial complaint. To be added as a defendant in Civil Action 134-1414

**MEMORANDUM:**

United States Supreme Court

365 U.S. 167

**MONROE, ET AL. v. PAPE, ET AL.**

No. 39. Argued: November 8, 1960. --- Decided: February 20, 1961.

This case presents important questions concerning the construction of R.S. § 1979, 42 U.S.C. § 1983, 42 U.S.C.A. § 1983, which reads as follows:

'Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'

The complaint alleges that 13 Chicago police officers broke into petitioners' home in the early morning, routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers. It further alleges that Mr. Monroe was then taken to the police station and detained on 'open' charges for 10 hours, while he was interrogated about a two-day-old murder, that he was not taken before a magistrate, though one was accessible, that he was not permitted to call his family or attorney, that he was subsequently released without criminal charges being preferred against him. It is alleged that the officers had no search warrant and no arrest warrant and that they acted 'under color of the statutes, ordinances, regulations, customs and usages' of Illinois and of the City of Chicago. Federal jurisdiction was asserted under R.S. § 1979, which we have set out above, and 28 U.S.C. § 1343, 28 U.S.C.A. s 1343, [1] and 28 U.S.C. § 1331, 28 U.S.C.A. § 1331. [2]

The City of Chicago moved to dismiss the complaint on the ground that it is not liable under the Civil Rights Acts nor for acts committed in performance of its governmental functions. All defendants moved to dismiss, alleging that the complaint alleged no cause of action under those Acts or under the Federal Constitution. The District Court dismissed the complaint. The Court of Appeals affirmed, 272 F.2d 365, relying on its earlier decision, Stift v. Lynch, 7 Cir.,267 F.2d 237. The case is here on a writ of certiorari which we granted because of a seeming conflict of that ruling with our prior cases. 362 U.S. 926, 80 S.Ct. 756, 4 L.Ed.2d 745.

Petitioners claim that the invasion of their home and the subsequent search without a warrant and the arrest and detention of Mr. Monroe without a warrant and without arraignment constituted a deprivation of their 'rights, privileges, or immunities secured by the Constitution' within the meaning of R.S. § 1979. It has been said that when 18 U.S.C. § 241, 18 U.S.C.A. § 241, made criminal a conspiracy 'to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution,' it embraced only rights that an individual has by reason of his relation to the central government, not to state governments. United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758. Cf. United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340. But the history of the section of the Civil Rights Act presently involved does not permit such a narrow interpretation.

Section 1979 came onto the books as § 1 of the Ku Klux Act of April 20, 1871. 17 Stat. 13. It was one of the means whereby Congress exercised the power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment. [3] Senator Edmunds, Chairman of the Senate Committee on the Judiciary, said concerning this section:

'The first section is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill, [4] which has since become a part of the Constitution,' [5] viz., the Fourteenth Amendment.

Its purpose is plain from the title of the legislation, 'An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes.' 17 Stat. 13. Allegation of facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment satisfies to that extent the requirement of R.S. § 1979. See Douglas v. City of Jeannette, 319 U.S. 157, 161-162, 63 S.Ct. 877, 880, 87 L.Ed. 1324. So far petitioners are on solid ground. For the guarantee against unreasonable searches and seizures contained in the Fourth Amendment has been made applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; Elkins v. United States, 364 U.S. 206, 213, 80 S.Ct. 1437, 1441, 4 L.Ed.2d 1669.

There can be no doubt at least since Ex parte Virginia, 100 U.S. 339, 346-347, 25 L.Ed. 676, that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it. See Home Tel. & Tel. Co. v. City of Los Angeles, 227 U.S. 278, 287-296, 33 S.Ct. 312, 314, 318, 57 L.Ed. 510. The question with which we now deal is the narrower one of whether Congress, in enacting § 1979, meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position. Cf. Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774;

Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368. We conclude that it did so intend.

It is argued that 'under color of' enumerated state authority excludes acts of an official or policeman who can show no authority under state law, state custom, or state usage to do what he did. In this case it is said that these policemen, in breaking into petitioners' apartment, violated the Constitution [6] and laws of Illinois. It is pointed out that under Illinois law a simple remedy is offered for that violation and that, so far as it appears, the courts of Illinois are available to give petitioners that full redress which the common law affords for violence done to a person; and it is earnestly argued that no 'statute, ordinance, regulation, custom or usage' of Illinois bars that redress.

The Ku Klux Act grew out of a message sent to Congress by President Grant on March 23, 1871, reading:

'A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore, I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. * * *' [7]

The legislation-in particular the section with which we are now concerned-had several purposes. There are threads of many thoughts running through the debates. One who reads them in their entirety sees that the present section had three main aims.

First, it might, of course, override certains kinds of state laws. Mr. Sloss of Alabama, in opposition, spoke of that object and emphasized that it was irrelevant because there were no such laws: [8]

'The first section of this bill prohibits any invidious legislation by States against the rights or privileges of citizens of the United States. The object of this section is not very clear, as it is not pretended by its advocates on this floor that any State has passed any laws endangering the rights or privileges of the colored people.'

Second, it provided a remedy where state law was inadequate. That aspect of the legislation was summed up as follows by Senator Sherman of Ohio:

'* * * it is said the reason is that any offense may be committed upon a negro by a white man, and a negro cannot testify in any case against a white man, so that the only way by which any conviction can be had in Kentucky in those cases is in the United States courts, because the United States courts enforce the United States laws by which negroes may testify.' [9]

But the purposes were much broader. The third aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice. The opposition to the measure complained that 'It overrides the reserved powers of the States,' [10] just as they argued that the second section of the bill 'absorb(ed) the entire jurisdiction of the State over their local and domestic affairs.' [11]

This Act of April 20, 1871, sometimes called 'the third 'force bill,'' was passed by a Congress that had the Klan 'particularly in mind.' [12] The debates are replete with references to the lawless conditions existing in the South in 1871. There was available to the Congress during these debates a report, nearly 600 pages in length, dealing with the activities of the Klan and the inability of the state governments to cope with it. [13] This report was drawn on by many of the speakers. [14] It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that furnished the powerful momentum behind this 'force bill.' Mr. Lowe of Kansas said:

'While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress.' [15]

Mr. Beatty of Ohio summarized in the House the case for the bill when he said:

'* * * certain States have denied to persons within their jurisdiction the equal protection of the laws. The proof on this point is voluminous and unquestionable. * * * (M)en were murdered, houses were burned, women were outraged, men were scouraged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. The State, from lack of power or inclination, practically denied the equal protection of the law to these persons.' [16]

While one main scourge of the evil-perhaps the leading one was the Ku Klux Klan, [17] the remedy created was not a remedy against it or its members but against those who representing a State in some capacity were unable or unwilling to enforce a state law. Senator Osborn of Florida put the problem in these terms: [18]

'That the State courts in the several States have been unable to enforce the criminal laws of their respective States or to suppress the disorders existing, and in fact that the preservation of life and property in many sections of the country is beyond the power of the State government, is a sufficient reason why Congress should, so far as they have authority under the Constitution, enact the laws necessary for the protection of citizens of the United States. The question of the constitutional authority for the requisite legislation has been sufficiently discussed.'

There was, it was said, no quarrel with the state laws on the books. It was their lack of enforcement that was the nub of the difficulty. Speaking of conditions in Virginia, Mr. Porter of that State said: [19]

'The outrages committed upon loyal men there are under the forms of law.'

Mr. Burchard of Illinois pointed out that the statutes of a State may show no discrimination: [20]

'If the State Legislature pass a law discriminating against any portion of its citizens, or if it fails to enact provisions equally applicable to every class for the protection of their person and property, it will be admitted that the State does not afford the equal protection. But if the statutes show no discrimination, yet in its judicial tribunals one class is unable to secure that enforcement of their rights and punishment for their infraction which is accorded to another, or if secret combinations of men are allowed by the Executive to band together to deprive one class of citizens of their legal rights without a proper effort to discover, detect, and punish the violations of law and order, the State has not afforded to all its citizens the equal protection of the laws.'

'Now, it is an effectual denial by a State of the equal protection of the laws when any class of officers charged under the laws with their administration permanently and as a rule refuse to extend that protection. If every sheriff in South Carolina refuses to serve a writ for a colored man and those sheriffs are kept in office year after year by the people of South Carolina, and no verdict against them for their failure of duty can be obtained before a South Carolina jury, the State of South Carolina, through the class of officers who are its representatives to afford the equal protection of the laws to that class of citizens, has denied that protection. If the jurors of South Carolina constantly and as a rule refuse to do justice between man and man where the rights of a particular class of its citizens are concerned, and that State affords by its legislation no remedy, that is as much a denial to that class of citizens of the equal protection of the laws as if the State itself put on its statute-book a statute enacting that no verdict should be rendered in the courts of that State in favor of this class of citizens.' Senator Pratt of Indiana spoke of the discrimination against Union sympathizers and Negroes in the actual enforcement of the laws: [22]

'Plausibly and sophistically it is said the laws of North Carolina do not discriminate against them; that the provisions in favor of rights and liberties are general; that the courts are open to all; that juries, grand and petit, are commanded to hear and redress without distinction as to color, race, or political sentiment.

'But it is a fact, asserted in the report, that of the hundreds of outrages committed upon loyal people through the agency of this Ku Klux organization not one has been punished. This defect in the administration of the laws does not extend to other cases. Vigorously enough are the laws enforced against Union people. They only fail in efficiency when a man of known Union sentiments, white or black, invokes their aid. Then Justice closes the door of her temples.'

It was precisely that breadth of the remedy which the opposition emphasized. Mr. Kerr of Indiana referring to the section involved in the present litigation said:

'This section gives to any person who may have been injured in any of his rights, privileges, or immunities of person or property, a civil action for damages against the wrongdoer in the Federal courts. The offenses committed against him may be the common violations of the municipal law of his State. It may give rise to numerous vexations and outrageous prosecutions, inspired by mere mercenary considerations, prosecuted in a spirit of plunder, aided by the crimes of perjury and subornation of perjury, more reckless and dangerous to society than the alleged offenses out of which the cause of action may have arisen. It is a covert attempt to transfer another large portion of jurisdiction from the State tribunals, to which it of right belongs, to those of the United States. It is neither authorized nor expedient, and is not calculated to bring peace, or order, or domestic content and prosperity to the disturbed society of the South. The contrary will certainly be its effect.' [23]

Mr. Voorhees of Indiana, also speaking in opposition, gave it the same construction: [24]

'And now for a few moments let us inspect the provisions of this bill, inspired as it is by the waning and decaying fortunes of the party in power, and called for, as I have shown, by no public necessity whatever. The first and second sections are designed to transfer all criminal jurisdiction from the courts of the States to the courts of the United States. This is to be done upon the assumption that the courts of the southern States fail and refuse to do their duty in the punishment of offenders against the law.'

Senator Thurman of Ohio spoke in the same vein about the section we are now considering: [25]

'It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrongdoer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. The deprivation may be of the slightest conceivable character, the damages in the estimation of any sensible man may not be five dollars or even five cents; they may be what lawyers call merely nominal damages; and yet by this section jurisdiction of that civil action is given to the Federal courts instead of its being prosecuted as now in the courts of the States.'

The debates were long and extensive. It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.

Much is made of the history of § 2 of the proposed legislation. As introduced § 2 was very broad:

'* * * if two or more persons shall, within the limits of any State, band, conspire, or combine together to do any act in violation of the rights, privileges, or immunities of any person, to which he is entitled under the Constitution and laws of the United States, which, committed within a place under the sole and exclusive jurisdiction of the United States, would, under any law of the United States then in force, constitute the crime of either murder, manslaughter, mayhem, robbery, assault and battery, perjury, subornation of perjury, criminal obstruction of legal process or resistance of officers in discharge of official duty, arson, of larceny; and if one or more of the parties to said conspiracy or combination shall do any act to effect the object thereof, all the parties to or engaged in said conspiracy or combination, whether principals or accessories, shall be deemed guilty of a felony * * *.'

It was this provision that raised the greatest storm. It was § 2 that was rewritten so as to be in the main confined to conspiracies to interfere with a federal or state officer in the performance of his duties. 17 Stat. 13. Senator Trumbull said: [26]

'Those provisions were changed, and as the bill passed the House of Representatives, it was understood by the members of that body to go no further than to protect persons in the rights which were guarantied to them by the Constitution and laws of the United States, and it did not undertake to furnish redress for wrongs done by one person upon another in any of the

States of the Union in violation of their laws, unless he also violated some law of the United States, nor to punish one person for an ordinary assault and battery committed on another in a State.'

But § 1-the section with which we are here concerned-was not changed as respects any feature with which we are presently concerned. [27] The words 'under color of' law were in the legislation from the beginning to the end. The changes hailed by the opposition-indeed the history of the evolution of § 2 much relied upon now-are utterly irrelevant to the problem before us, viz., the meaning of 'under color of' law. The vindication of States' rights which was hailed in the amendments to § 2 raises no implication as to the construction to be given to 'color of any law' in § 1. The scope of § 1-under any construction-is admittedly narrower than was the scope of the original version of § 2. Opponents of the Act, however, did not fail to note that by virtue of § 1 federal courts would sit in judgment on the misdeeds of state officers. [28] Proponents of the Act, on the other hand, were aware of the extension of federal power contemplated by every section of the Act. They found justification, however, for this extension in considerations such as those advanced by Mr. Hoar: [29]

'The question is not whether a majority of the people in a majority of the States are likely to be attached to and able to secure their own liberties. The question is not whether the majority of the people in every State are not likely to desire to secure their own rights. It is, whether a majority of the people in every State are sure to be so attached to the principles of civil freedom and civil justice as to be as much desirous of preserving the liberties of others as their own, as to insure that under no temptation of party spirit, under no political excitement, under no jealousy of race or caste, will the majority either in numbers or strength in any State seek to deprive the remainder of the population of their civil rights.'

Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates. It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court.

We had before us in United States v. Classic, supra, § 20 of the Criminal Code, 18 U.S.C. § 242, 18 U.S.C.A. § 242, [30] which provides a criminal punishment for anyone who 'under color of any law, statute, ordinance, regulation, or custom' subjects any inhabitant of a State to the deprivation of 'any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.' Section 242 first came into the law as § 2 of the Civil Rights Act, Act of April 9, 1866, 14 Stat. 27. After passage of the Fourteenth Amendment, this provision was re-enacted and amended by §§ 17, 18, Act of May 31, 1870, 16 Stat. 140, 144. [31] The right involved in the Classic case was the right of voters in a primary to have their votes counted. The laws of Louisiana required the defendants 'to count the ballots, to record the result of the count, and to certify the result of the election.' United States v. Classic, supra, 313 U.S. 325-326, 61 S.Ct. 1043. But according to the indictment they did not perform their duty. In an opinion written by Mr. Justice (later Chief Justice) Stone, in which Mr. Justice Roberts, Mr. Justice Reed, and Mr. Justice Frankfurter joined, the Court ruled, 'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.' Id., 313 U.S. 326, 61 S.Ct. 1043. There was a dissenting opinion; but the ruling as to the meaning of 'under color of' state law was not questioned.

That view of the meaning of the words 'under color of' state law, 18 U.S.C. § 242, 18 U.S.C.A. § 242, was reaffirmed in Screws v. United States, supra, 325 U.S. 108-113, 65 S.Ct. 1038-1041. The acts there complained of were committed by state officers in performance of their duties, viz., making an arrest effective. It was urged there, as it is here, that 'under color of' state law should not be construed to duplicate in federal law what was an offense under state law. Id., 325 U.S. 138-149, 157-161, 65 S.Ct. 1053-1058, 1061-1063 (dissenting opinion). It was said there, as it is here, that the ruling in the Classic case as to the meaning of 'under color of' state law was not in focus and was ill-advised. Id., 325 U.S. 146-147, 65 S.Ct. 1056-1057 (dissenting opinion). It was argued there, as it is here, that 'under color of' state law included only action taken by officials pursuant to state law. Id., 325 U.S. 141-146, 65 S.Ct. 1054-1056 (dissenting opinion). We rejected that view. Id., 325 U.S. 110-113, 114-117, 65 S.Ct. 1039-1041, 1041-1043 (concurring opinion). We stated:

'The construction given § 20 (18 U.S.C. § 242, 18 U.S.C.A. § 242) in the Classic case formulated a rule of law which has become the basis of federal enforcement in this important field. The rule adopted in that case was formulated after mature consideration. It should be good for more than one day only. We do not have here a situation comparable to Mahnich v. Southern S.S.C.o., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, where we overruled a decision demonstrated to be a sport in the law and inconsistent with what preceded and what followed. The Classic case was not the product of hasty action or inadvertence. It was not out of line with the cases which preceded. It was designed to fashion the governing rule of law in this important field. We are not dealing with constitutional interpretations which throughout the history of the Court have wisely remained flexible and subject to frequent re-examination. The meaning which the Classic case gave to the phrase 'under color of any law' involved only a construction of the statute. Hence if it states a rule undesirable in its consequences, Congress can change it. We add only to the instability and uncertainty of the law if we revise the meaning of § 20 (18 U.S.C. § 242, 18 U.S.C.A. § 242) to meet the exigencies of each case coming before us.' Id., 325 U.S. 112-113, 65 S.Ct. 1040-1041.

We adhered to that view in Williams v. United States, supra, 341 U.S. 99, 71 S.Ct. 578.

Mr. Shellabarger, reporting out the bill which became the Ku Klux Act, said of the provision with which we now deal:

'The model for it will be found in the second section of the act of April 9, 1866, known as the 'civil rights act.' * * * This section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights * * *.' [32]

Thus, it is beyond doubt that this phrase should be accorded the same construction in both statutes-in § 1979 and in 18 U.S.C. § 242, 18 U.S.C.A. § 242.

Since the Screws and Williams decisions, Congress has had several pieces of civil rights legislation before it. In 1956 one bill reached the floor of the House. This measure had at least one provision in it penalizing actions taken 'under color of law or otherwise.' [33] A vigorous minority report was filed attacking, inter alia, the words 'or otherwise.' [34] But not a word of criticism of the phrase 'under color of' state law as previously construed by the Court is to be found in that report.

Section 131(c) of the Act of September 9, 1957, 71 Stat. 634, 637, amended 42 U.S.C. § 1971, 42 U.S.C.A. § 1971, by adding a new subsection which provides that no person 'whether acting under color of law or otherwise' shall intimidate any other person in voting as he chooses for federal officials. A vigorous minority report was filed [35] attacking the wide scope of the new subsection by reason of the words 'or otherwise.' It was said in that minority report that those words went far beyond what this Court had construed 'under color of law' to mean. [36] But there was not a word of criticism directed to the prior construction given by this Court to the words 'under color of' law.

The Act of May 6, 1960, 74 Stat. 86, 42 U.S.C.A. §§ 1971, 1974 et seq., uses 'under color of' law in two contexts, once when § 306 defines 'officer of election' and next when § 601(a) gives a judicial remedy on behalf of a qualified voter denied the opportunity to register. Once again there was a Committee report containing minority views. [37] Once again no one challenged the scope given by our prior decisions to the phrase 'under color of' law.

If the results of our construction of 'under color of' law were as horrendous as now claimed, if they were as disruptive of our federal scheme as now urged, if they were such an unwarranted invasion of States' rights as pretended, surely the voice of the opposition would have been heard in those Committee reports. Their silence and the new uses to which 'under color of' law have recently been given reinforce our conclusion that our prior decisions were correct on this matter of construction.

We conclude that the meaning given 'under color of' law in the Classic case and in the Screws and Williams cases was the correct one; and we adhere to it.

In the Screws case we dealt with a statute that imposed criminal penalties for acts 'wilfully' done. We construed that word in its setting to mean the doing of an act with 'a specific intent to deprive a person of a federal right.' 325 U.S. at page 103, 65 S.Ct. at page 1036. We do not think that gloss should be placed on § 1979 which we have here. The word 'wilfully' does not appear in § 1979. Moreover, § 1979 provides a civil remedy, while in the Screws case we dealt with a criminal law

challenged on the ground of vagueness. Section 1979 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.

So far, then, the complaint states a cause of action. There remains to consider only a defense peculiar to the City of Chicago.

The City of Chicago asserts that it is not liable under § 1979. We do not stop to explore the whole range of questions tendered us on this issue at oral argument and in the briefs. For we are of the opinion that Congress did not undertake to bring municipal corporations within the ambit of § 1979.

When the bill that became the Act of April 20, 1871, was being debated in the Senate, Senator Sherman of Ohio proposed an amendment which would have made 'the inhabitants of the county, city, or parish' in which certain acts of violence occurred liable 'to pay full compensation' to the person damaged or his widow or legal representative. [38] The amendment was adopted by the Senate. [39] The House, however, rejected it. [40] The Conference Committee reported another version. [41] The House rejected the Conference report. [42] In a second conference the Sherman amendment was dropped and in its place § 6 of the Act of April 20, 1871, was substituted. [43] This new section, which is now R.S. § 1981, 42 U.S.C. § 1986, 42 U.S.C.A. § 1986, dropped out all provision for municipal liability and extended liability in damages to 'any person or persons, having knowledge that any' of the specified wrongs are being committed. Mr. Poland, speaking for the House Conferees about the Sherman proposal to make municipalities liable, said:

'We informed the conferees on the part of the Senate that the House had taken a stand on that subject and would not recede from it; that that section imposing liability upon towns and counties must go out or we should fail to agree.' [44]

The objection to the Sherman amendment stated by Mr. Poland was that 'the House had solemnly decided that in their judgment Congress had no constitutional power to impose any obligation upon county and town organizations, the mere instrumentality for the administration of state law.' [45] The question of constitutional power of Congress to impose civil liability on municipalities was vigorously debated with powerful arguments advanced in the affirmative. [46]

Much reliance is placed on the Act of February 25, 1871, 16 Stat. 431, entitled 'An Act prescribing the Form of the enacting and resolving Clauses of Acts and Resolutions of Congress, and Rules for the Construction thereof.' Section 2 of this Act provides that 'the word 'person' may extend and be applied to bodies politic and corporate.' [47] It should be noted, however, that this definition is merely an allowable, not a mandatory, one. It is said that doubts should be resolved in favor of municipal liability because private remedies against officers for illegal searches and seizures are conspicuously ineffective, [48] and because municipal liability will not only afford plaintiffs responsible defendants but cause those defendants to eradicate abuses that exist at the police level.[49] We do not reach those policy considerations. Nor do we reach the constitutional question whether Congress has the power to make municipalities liable for acts of its officers that violate the civil rights of individuals.

The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word 'person' was used in this particular Act to include them. [50] Accordingly we hold that the motion to dismiss the complaint against the City of Chicago was properly granted. But since the complaint should not have been dismissed against the officials the judgment must be and is reversed.

Reversed.

Mr. Justice HARLAN, whom Mr. Justice STEWART joins, concurring.

Mr. Justice FRANKFURTER, dissenting except insofar as the Court holds that this action cannot be maintained against the City of Chicago.

## Notes[edit]

**^1** This section provides in material part:

'The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

'(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.'

^2 Subsection (a) provides:

'The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.'

In their complaint, petitioners also invoked R.S. §§ 1980, 1981, 42 U.S.C. §§ 1985, 1986, 42 U.S.C.A. §§ 1985, 1986. Before this Court, however, petitioners have limited their claim to recovery to the liability imposed by § 1979. Accordingly, only that section is before us.

^3 See Cong.Globe, 42d Cong., 1st Sess., App. 68, 80, 83-85.

^4 Act of April 9, 1866, 14 Stat. 27.

^5 Supra, note 3, 568.

^6 Illinois Const., Art. II, § 6, S.H.A.Const., provides:

'The right of the people to be secure in their persons, houses, paper and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue without probable cause, supported by affidavit, particularly describing the place to be searched, and the persons or things to be seized.' Respondents also point to Ill.Rev.Stat., c. 38, §§ 252, 449.1; Chicago, Illinois, Municipal Code, § 11-40.

^7 Cong.Globe, 42d Cong., 1st Sess., p. 244.

^8 Id., App. 268.

^9 Id., p. 345.

^10 Id., p. 365. The speaker, Mr. Arthur of Kentucky, had no doubts as to the scope of § 1: '(I)f the sheriff levy an execution, execute a writ, serve a summons, or make an arrest, all acting under a solemn, official oath, though as pure in duty as a saint and as immaculate as a seraph, for a mere error of judgment, (he is liable) * * *.' Ibid. (Italics added.)

^11 Id., p. 366.

^12 Randall, The Civil War and Reconstruction (1937), p. 857.

^13 S.Rep. No. 1, 42d Cong., 1st Sess.

^14 See, e.g., Cong.Globe, 42d Cong., 1st Sess., App. 166 167.

^15 Id., p. 374.

^16 Id., p. 428.

^17 As Randall, op. cit., supra, note 12, p. 855, says in discussing the Ku Klux Klan: 'A friendly view of the order might represent it as an agency of social control in the South. Yet it never attained the dignity of the vigilance committees of the western states nor of the committees of safety of Revolutionary times.'

^18 Cong.Globe, 42d Cong., 1st Sess. 653.

^19 Id., App. 277.

^20 Id., App. 315.

^22 Id., p. 505.

**^23** Id., App., p. 50. Mr. Golladay of Tennessee expressed the same concern:

'Is the great State of New York invaded every time a murder is committed within her bounds? Was the great State of Pennsylvania invaded when rioters in the city of Philadelphia burned a public building? Was the great State of Massachusetts invaded when Webster, one of her first scholars, within the walls of Harvard murdered Parkman, or later, when evil-disposed persons violated her laws in Lowell? Did they require the Army and Navy and martial law? And, sir, because a midnight murderer is sometimes found in the South it should not be regarded as an invasion.' Id., App. 160.

**^24** Id., App. 179.

**^25** Id., App. 216.

**^26** Id., p. 579.

**^27** Section 1 in the bill as originally introduced read as follows:

'That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication,' and the other remedial laws of the United States which are in their nature applicable in such cases.'

**^28** See text at note 23, supra; see note 10, supra.

**^29** Cong. Globe, 42d Cong., 1st Sess., pp. 334-335.

**^30** Then 18 U.S.C. § 52.

**^31** For a full history of the evolution of 18 U.S.C. § 242, 18 U.S.C.A. § 242, see Screws v. United States, 325 U.S. 91, 98 100, 65 S.Ct. 1031, 1033-1034, 89 L.Ed. 1495; United States v. Classic, 313 U.S. 299, 327, note 10, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368; cf. Hague v. Committee for Industrial Organization,307 U.S. 496, 509-510, 59 S.Ct. 954, 961, 83 L.Ed. 1423.

**^32** Cong. Globe, 42d Cong., 1st Sess., App. 68.

**^33** H.R.Rep. No. 2187, 84th Cong., 2d Sess., p. 16.

**^34** Id., p. 26.

**^35** H.R.Rep. No. 291, 85th Cong., 1st Sess., pp. 24-60, U.S.Code Congressional and Administrative News 1957, p. 1966.

**^36** Id., pp. 57-58.

**^37** H.R.Rep. No. 956, 86th Cong., 1st Sess., pp. 32-42, U.S.Code Congressional and Administrative News 1960, p. 1939.

**^38** Cong., Globe, 42d Cong., 1st Sess., p. 663. The proposed amendment read:

'That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together; and if such offense was committed to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the inhabitants of the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense if living, or to his widow or legal representative if dead; and such compensation may be recovered by such person or

his representative by a suit in any court of the United States of competent jurisdiction in the district in which the offense was committed, to be in the name of the person injured, or his legal representative, and against said county, city, or parish. And execution may be issued on a judgment rendered in such suit and may be levied upon any property, real or personal, of any person in said county, city, or parish, and the said county, city, or parish may recover the full amount of such judgment, costs and interest, from any person or persons engaged as principal or accessory in such riot in an action in any court of competent jurisdiction.'

**^39** Id., 704-705.

**^40** Id., 725.

**^41** 'That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down,

burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together, with intent to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense, if living, or to his widow or legal representative if dead; and such compensation may be recovered in an action on the case by such person or his representative in any court of the United States of competent jurisdiction in the district in which the offense was committed, such action to be in the name of the person injured, or his legal representative, and against said county, city, or parish, and in which action any of the parties committing such acts may be joined as defendants. And any payment of any judgment, or part thereof unsatisfied, recovered by the plaintiff in such action, may, if not satisfied by the individual defendant therein within two months next after the recovery of such judgment upon execution duly issued against such individual defendant in such judgment, and returned unsatisfied, in whole or in part, be enforced against such county, city, or parish, by execution, attachment, mandamus, garnishment, or any other proceeding in aid of execution or applicable to the enforcement of judgments against municipal corporations; and such judgment shall be a lien as well upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof. And the court in any such action may on motion cause additional parties to be made therein prior to issue joined, to the end that justice may be done. And the said county, city, or parish may recover the full amount of such judgment, by it paid, with costs and interest, from any person or persons engaged as principal or accessory in such riot, in an action in any court of competent jurisdiction. And such county, city, or parish, so paying, shall also be subrogated to all the plaintiff's rights under such judgment.' Id., 749.

**^42** Cong. Globe, 42d Cong., 1st Sess. 800-801.

**^43** Id., 804.

**^44** Id., 804.

**^45** Idid.

**^46** See especially the comments of Senator Sherman. Id., 820 821.

**^47** This Act has been described as an instance where 'Congress supplies its own dictionary.' Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 527, 536. The present code provision defining 'person' (1 U.S.C. § 1, 1 U.S.C.A. § 1) does not in terms apply to bodies politic. See Reviser's Note, Vol. I, Rev.U.S.Stats.1872, p. 19.

**^48** See note, 100 U. of Pa.L.Rev. 1182, 1206-1212.

**^49** See Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn.L.Rev. 493, 514. Cf. Fuller & Casner, Municipal Tort Liability in Operation, 54 Harv.L.Rev. 437, 459.

**^50** This has been the view of the lower federal courts. Charlton v. City of Hialeah, 5 Cir., 188 F.2d 421, 423; Hewitt v. City of Jacksonville, 5 Cir., 188 F.2d 423, 424; Cobb v. City of Malden, 1 Cir., 202 F.2d 701, 703; Agnew v. City of Compton, 9 Cir., 239 F.2d 226, 230; Cuiksa v. City of Mansfield, 6 Cir., 250 F.2d 700, 703-704. In a few cases in which equitable relief has been sought, a municipality has been named, along with city officials, as defendant where violations of 42 U.S.C. § 1983, 42 U.S.C.A. § 1983, were alleged. See e.g., Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 882, 87 L.Ed. 1324; Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776. The question dealt with in our opinion was not raised in those cases, either by the parties or by the Court. Since we hold that a municipal corporation is not a 'person' within the meaning of § 1983, no inference to the contrary can any longer be drawn from those cases.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

    Plaintiff                                  CIVIL ACTION NO.

v.                                         13-1414

CITY OF PHILADELPHIA, ET AL..,       JURY TRIAL DEMANDED

    Defendant

### CERTIFICATE OF SERVICE

I, Franklyn Prillerman, do hereby certify that on this date a correct copy of Plaintiff's Amendments to Complaint CV13-1414 Pursuant to Rule 15(a) was sent via first class mail to:

Armando Brigandi
City of Philadelphia Lawe Department
Civil Rights Unit
\1515 Arch St, 14th fl
Philadelphia, PA 19102

Date: December 21, 2015

Respectfully submitted,

/s/ Franklyn D. Pillerman
123 E. Pomona St.
Philadelphia, PA 19144