IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

       Plaintiff                   CIVIL ACTION NO.

     v.                        13-1414

CITY OF PHILADELPHIA, ET AL..,       JURY TRIAL DEMANDED

       Defendant

## **ORDER**

AND NOW this day_____ of_____,2016, upon consideration of Defendant's, the City of

Philadelphia, Motion to for Summary Judgement and any response thereto, it is hereby ORDERED and
DECREED that the Motion is DENIED.

BY THE COURT;

_____

Rufe, J.

FRANKLYN DEVON PRILLERMAN

Plaintiff

v.

CITY OF PHILADELPHIA, ET AL.,

Defendant

CIVIL  ACTION NO.

13-1414

JURY TRIAL DEMANDED

FILED

MAY – 6 2016

MICHAEL E. KUNZ, Clerk
D._____Dep. Clerk

## PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGEMENT

## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

Plaintiff, Franklyn Devon Prillerman's response to Defendants' City of Philadelphia, Correction Officer Tanya Lynch and Corrections Officer Sylvia Melton's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Honorable Court's Policies and Procedures.

### I. Issues and Subissues

    **1. Plaintiff asserts that he is a Pro se litigant and request "wide latitude" of interpretation of this filing by this Honorable Court.**

    **2. In response to Defendants' assertion that no jury could find that Plaintiff has met his burden of showing that he suffered a physical injury as is required by the Prisoner Civil Rights Litigation Reform Act, 28 U.S.C. section 1346(b)(2).**

        A. The Plaintiff asserts 28 U.S.C. section 1346(b)(2) is not applicable in the instant case in that it applies to incarcerated citizens bringing suit against the U.S. government.

        B. The Plaintiff asserts The Prisoner Litigation Reform Act in general and section 1997(e) specifically, violates Article III, section 1; Article VI, clause 2, the 14th Amendment, section 5 , the Supremacy Clause and the Equal Protection and Due Process protections of the United States Constitution.  Plaintiff offers in support the following:

        (1) The government's own actions created the circumstances complained of (the overburdening of the Federal Courts) to be remedied by The Prisoner Litigation Reform Act .

        (a) From 1980 - 1994, Congress has been extending federal jurisdiction over crime control to areas once considered to be within state and local jurisdiction (e. g., juvenile justice and gun control), and enlarging federal support of state and local efforts to combat crime. It passed three

1

omnibus crime control bills since 1984. The Comprehensive Crime Control Act of 1984 (P. L. 98-473) overhauled the federal sentencing system and revised bail and forfeiture procedures along with other federal practices. The Crime Control Act of 1990 (P. L. 101-647) codified a Crime Victims' Bill of Rights in the federal justice system and directed the U. S. Sentencing Commission to amend certain sentencing guidelines. The Violent Crime Control and Law Enforcement Act of 1994 (P. L. 103-322) authorized funding for law enforcement and crime prevention measures including increasing the number of crimes punishable by death and establishing a "three-strikes" provision for violent offenders (JoAnne O'Bryant and Lisa Seghetti, Congressional Research Service   Policy Almanac http://www.policyalmanac.org/crime/archive/crs_federal_crime_policy.shtml Updated September 12, 2002)

(b).  Relative to the number of U.S. residents, the rate of incarceration in prisons at year end 1996 totaled 427 sentenced inmates per 100,000 residents –up from 292 in 1990.(Bureau of Justice Statistics Bulletin, June 1997, NCJ 164619, page 1) (exhibit 1)

(c).  Factors underlying the growth in the State prison population between 1985 and 1995 include a 91% rise in the number of admissions from 1985 to 1990 and a 13% rise in admissions from 1990-1995. .(Bureau of Justice Statistics Bulletin, Highlights, June 1996, NCJ 164619, page 1) (exhibit 2)

(d)  The increased incarcerations rates from 1985-1996 exacerbated overcrowding in State prison from 5% over highest housing capacity in 1985 to 16% over capacity in 1996. .(Bureau of Justice Statistics Bulletin, Highlights, June 1997, NCJ 164619, page 1)(exhibit 1)

(e).  The crime bills cited above,1(a), as designed and intended, led to hyper growth of the federal, state and county prison populations, thereby stressing the infrastructure (physical plant and services) of said institutions.  An expected consequence of these stresses was prison overcrowding, the inability to deliver adequate timely medical services, rehabilitation services,  mental health services and provide and sanitary environment and other constitutional required services. Consequently leading to increased (sic) section 1983 filings and court ordered consent decrees to remedy constitutional violations, which placed economic burdens on federal, state and local governments. (In example: See, e.g., Rhodes v. Chapman, 452 U.S. 337, 339 (1981) (alleging that the housing of two prisoners in a single cell is cruel and unusual punishment); Nami v. Fauver, 82 F.3d 63, 65-66 (3d Cir. 1996) (alleging that the housing of two inmates in single cell, together with inadequate medical care, recreation, access to bathrooms, and rehabilitation programs, violates the Constitution); Ingalls v. Florio, 968 F. Supp. 193,

197 (D.N.J. 1997) (alleging that insufficient housing space, together with inadequate sanitation, recreation, and food, violates the Eighth Amendment).

(2) The government's assertion that the Federal Courts were overburdened by frivolous 1983 litigation by prisoners is unsubstantiated by the quantitative and qualitative evidence established and provided by the Federal Courts and the Department of Justice.

(a). In introducing the PLRA Senator Dole stated, "According to the enterprise institute scholar, Walter Berns, the number of due process and cruel and unusual punishment complaints filed by prisoners has grown astronomically—from 6,000 in 1975 to 39000 in 1994." (141 Congressional Record S7524-7525, May 25, 1995) (exhibit 3)

(b) In 1975 state prisoners did not have a right to access to law libraries. State prisoners were granted access to law libraries until 1977 (Bounds v. Smith U.S. 817(1977). So with access to law libraries, reasonably 1983 law suits by state prisoners increased, which was the inherent purpose of the law to provide access to remedy to prisoners through the courts. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts.(exhibit 4)

(c). In introducing the Bill that would become the PLRA Sen Dole cited the astronomical growth of section 1983 filings by state prisoners. Sen Dole's assertion was not supported by the statistical data available at the time, 2.7% of state prisoners filed section 1983 claims in 1974 compared to 3.7% of state prisoners filing section 1983 claims in 1994, an increase of 1%. Over the same period 1974-1996 the state prison population grew 350%. Therefore it is reasonable to attribute the 1% state prisoner population per capita growth to the 350% growth in the population of state prisoners. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts. (exhibit 4)

(d). Civil case filings in the U.S. district courts increased from 236,400to 248,300, a 5 percent increase. This rise resulted mostly from increases in private cases involving federal question litigation. Federal question litigation rose 13 percent, primarily due to personal injury product liability cases which nearly doubled. This sizeable increase was due to breast implant cases which were removed from state to federal courts following the bankruptcy of Dow Corning. Other areas of federal question litigation

3

that increased were civil rights filings which rose 13 percent and prisoner petitions which rose 9 percent. In contrast, diversity of citizens cases declined 6 percent, mostly as a result of a 30 percent drop in personal injury/product liability cases.  Cases involving the U.S. Government as plaintiff or defendant dropped 5 percent, as a result of decreases in cases brought by the U.S. government to recover on defaulted student loans (down 13 percent) and overpayment of veteran's benefits (down 62 percent). (1995 Year End Judiciary Report, page 3, paragraph IIA(1), Chief Justice William Rehnquist.

(e)  Though Chief Justice Rehnquist cites a 9% increase in prisoner petitions, he does not cite the increase as a problem.  Furthermore, the Chief Justice does not separate out Habeus Corpus petitions or Writs of Mandamus from section 1983 petitions.

(f).  A thorough examination of, "REPORT OF THE PROCEEDINGS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES" years 1990-1996 finds no mention of prisoner 1983 filings as a burden to the federal courts.  However, the courts opposition to mandatory sentencing is cited in the September 1991 report, again in the March 1993 report and yet again in the September 1994 report. (http://www.uscourts.gov/about-federal-courts/reports-proceedings-1990)

(g)  The "injury" asserted by the government, the overburdening of the federal courts, is not borne out in the federal judicial statistics and reports.

(h).  Though the stated goal of the PLRA was to prevent the overburdening of the Federal Courts with frivolous prisoner lawsuits brought under Title 42 section 1983 (The actual number of frivolous 1983 law suits filed is not included in the Congressional record, only the total number of Title 42 section 1983 lawsuits, meritorious and frivolous).

(i).  At the time of the passing of the PLRA the incarcerated citizen per capita 1983 filing rate was approximately the same as it was in 1974. (as represented by the gap between the state prison population growth line and the section 1983 lawsuits line in the graph depicted on page 4 of the cited material) The actual number of filings was higher due to the increase in the actual number of people incarcerated in state prison which had grown from about 200,000 to over I million. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts (exhibit 4)

(j)  Plaintiff asserts that the government's politically motivated rhetoric is insufficient to establish an "injury" unsupported by facts.  Furthermore, in the absent of an actual injury, a "legislative remedy" which abridges the constitutional rights of citizens is injurious in and of itself.  The needed remedy is intervention by the court where the government lacks the political will to do what is right.

(3)  The government's purpose in enacting the Prisoner Litigation Act was to curtail Federal Courts intervention by "consent decree" , for the purpose of upholding the Constitutional rights of incarcerated citizens, into the Administration of State and Federal prisons, often resulting in Federal and State governments to spending more than they found reasonable on prisons.

(a).  Senator Dole further asserted , "Unfortunately, prisoner litigation does not operate in a vacuum.  Frivolous lawsuits filed by prisoners tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law abiding population."  In this statement Sen Dole seems to presume that all prisoner litigation is frivolous, in that he provides no data as to the number of frivolous or non- frivolous law suits.  Sen Dole referencing the PLRA, " This Amendment will help put an end to the inmate litigation fun-and- games- Senator Dole, during Senate debate on an early version of the PRLA, September 29, 1995. Senator Dole's statements give support to the premise that the 'personal injury' requirement of the PLRA was politically motivated to reduce meaningful section 1983 filings and subsequently reduce Federal Court intervention into state prisons, as opposed to being determined by available data.

(b).  On April 26, 1996, the PLRA became law. Section 802(a) of the act, codified as 18 U.S.C. § 3626, allows for the immediate termination of prospective relief in existing settlements involving prison conditions, and limits any future prospective relief to the constitutional minimum.

(c). The PLRA severely restricts a prisoner's ability to seek remedy for constitutional violations in the courts via section 1983 filings, the historical  and exclusive  pathway to federal court protection from abuse of incarcerated citizens by the government, thereby severely limiting federal court intervention by consent decree by abridgement of the constitutional rights of incarcerated citizens. The PRLA was used by the Congress to circumvent Article III section 1 of the U.S. Constitution, (**Article III, Section. 1** *The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.* ) on the backs of  prisoners, a group comprised of primarily the impoverished and the  uneducated citizenry.

(d) Since the passage of the PLRA all consent decrees legitimately in place in 1996 became null and void and the prospect of new consent decrees by the court has become highly unlikely, given the precipitous decline in section 1983 filings beginning in 1997. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts. (exhibit 4)

(e) In the period from 1995 to 2000 section 1983 filings declined 60 percent, and remained at the reduced level from 2000-2005. (U.S. Courts-Business of the Courts, Judicial Facts and Figures, 2005. www.uscourts.gov/statistics) (exhibit 5)

(f). The 60 percent decline in section 1983 filings is demonstrative of chilling effect of the PLRA on incarcerated citizens seeking redress through the courts for violations of their constitutional rights. Such a decline in filings warrants an examination by the courts through the filter of the U.S. Constitution and the interest of justice.

(4) The personal injury requirement of the PLRA does not meet the Constitutional requirements for "congruence and proportionality of the means adopted and the injury to be remedied.

(a). The 60 percent decline in section 1983 filings from 1995-2000, is demonstrative of chilling effect of the PLRA on incarcerated citizens seeking redress through the courts for violations of their constitutional rights.  Such a decline in filings warrants an extra look by the courts. (U.S. Courts-Business of the Courts, Judicial Facts and Figures, 2005. www.uscourts.gov/statistics) (exhibit 5)

*If the effect of the PLRA were to selectively discourage the filings of frivolous or meritless lawsuits, as its sponsors predicted, then we should expect to find prisoners winning a larger percentage of their lawsuits after the laws enactment than we did before.  But the most comprehensive study to date shows just the opposite: since passage of the PLRA, prisoners not only are filing fewer law suits, but are also succeeding in a smaller proportion of the cases they do file.  This strongly suggest that rather than filtering out meritless lawsuits, the PLRA has simply tilted the playing field against prisoners across the board.  The author of a comprehensive study on the impact of the  act concludes, "the PLRA's new decision standards have imposed new and very high hurdles so that even constitutionally meritorious cases are often  thrown out of court"*

( Congressional statement by David Fathi, US Director, Human Rights Watch,) ( http://hrw.org/english/docs/2007/11/07/usdom17277.htm)

(b)  The personal injury requirement devalues the constitutional rights of incarcerated citizens to nothing. Plaintiff asserts if one's constitutional rights have no value , absent physical injury, to the government, then defacto  that citizen  has no constitutional rights.  This assertion reflected in the many dismissals of meritorious claims of violations of citizens constitutional rights by the courts.

(c).  The courts have recognized there are some constitutional rights that are so fundamental to being an United States citizen and the spirit of America, that the "personal injury" requirement of the PLRA does not apply.

(d).  The court found that while the PLRA's purpose was to curtail litigation options available to prisoners, its purpose was not to insulate from review all claims in which legitimate constitutional claims predominate without accompanying physical harm, citing 28 USC § 1915(g). In so holding, the court followed Cannell v. Lightner , 143 F.3d 1210, 1213 (9th Cir. 1998) (First Amendment rights upheld absent physical injury); Williams v. Otis , 230 F.3d 1361 (6th Cir. 2000) (PLRA does not cover First Amendment retaliation claim); and Rowe v. Shake , 196 F.3d 778, 781 (7th Cir. 1999) (First Amendment claims require no injury showing).

Rowe v. Shake (citation above)

Mr. Rowe and Dr. Lant challenge the district court's decision to dismiss Mr. Rowe's claims because he did not allege the requirements of § 1997e(e). The section provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Although the applicability of § 1997e(e) to a prisoner's First Amendment claim presents an issue of first impression in this circuit, we have previously addressed the scope of the statute. See Robinson v. Page, 170 F.3d 747(7th Cir. 1999). In Robinson, we stated, "It would be a serious mistake to interpret section 1997e(e) to require a showing of physical injury in all prisoner civil rights suits." Id. at 748. We further observed that § 1997e(e) applies only to claims for mental or emotional injury. Id. Claims for other types of injury do not implicate the statute. Id. Here, Rowe alleges that prison officials violated his First Amendment rights by interfering with the receipt of his mail.

(5) Deprivation of 6th and 14th Amendment rights Standing alone is a cognizable injury for purposes of pursuing 1983 claim and bringing said claim to trial.

A deprivation of First Amendment rights standing alone is a cognizable injury. See Owen v. Lash, 682 F.2d 648, 652 n. 4 (7th Cir. 1982) (depriving citizen of right to correspond violates substantive guarantees of First and Fourteenth Amendments); cf. Brownsburg Area Patrons Affecting Change v. Baldwin, 137 F.3d 503, 507 (7th Cir. 1998) (ruling that plaintiff proved requisite irreparable harm required to secure preliminary injunction because the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury); National People's Action v. Village of Wilmette, 914 F.2d 1008, 1013 (7th Cir. 1990) (same). Indeed, Rowe does not allege that he suffered any additional injury as a consequence of his mail being delayed, nor must he. See Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998). A prisoner is entitled to judicial relief for a violation of his First Amendment rights aside from any physical, mental, or emotional injury he may have sustained.

(a) Plaintiff asserts, though the complaint in Rowe addresses a 1st and 14th amendment violation , the ruling of the Rowe court decision should be applied to 6th and 14th amendment violations as well. The court in Rowe asserts that any deprivation of a constitutionally protected right is injurious on its face. Plaintiff asserts that the deprivation of plaintiff's 6th and 14th amendment rights entitles plaintiff to relief aside from any physical, mental, or emotional injury.

(b) Throughout Plaintiff's pleadings he has claimed that the violations of his constitutional rights are injurious in and of itself. In the instant matter plaintiff asserts that official violated his 6th amendments rights by denying him privileged conversation with his attorney and violation of his 14th amendments rights to equal protection under the law and due process of law because his 6th amendment rights were violated because the defendants operated in violation of criminal procedures promulgated by the Pennsylvania Supreme Court in his instant case.

(c) In the U.S. Supreme Court's ruling in Boeme v. Flores 521 U.S. 507117 S. Ct. 2157,138 L. Ed. 2d 624,1997 U.S. overturned  the Religious Freedom Restoration Act finding the act exceeds congress' power,  a five Justice majority concluded:

" It is for Congress in the first instance to determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, ' and its conclusions are entitled to much deference...Congress' discretion is not unlimited, however, and the Courts retain the power, as they have since Marbury v. Madison, to determine if Congress has exceeded its authority under Constitution.

*Broad as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and free balance. The judgment of the Court of Appeals sustaining the ACT's constitutionality is reversed".*

(d) Plaintiff asserts that the "personal injury requirement" of the PLRA presents the same issue of Congressional overreach as occurred in the RFRA.

(6) The Personal Injury requirement of the PLRA violates the Supremacy Clause  and  the U.S. Constitution and International Treaties to which the U.S. Government is signatory

(a).  Under the U.S. Constitution, treaties signed and ratified by the United States " shall be the supreme Law of the Land"; US Constitution, Article VI, cl. 2.

(b).  The PLRA's physical injury requirement is inconsistent with US obligations under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment The United States ratified the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) in 1994. This treaty defines "torture" as

any act by which severe pain or suffering, *whether physical or mental,* is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT, Art. 1, sec. 1 (emphasis added). Thus, the intentional infliction of severe mental pain or suffering by prison officials can constitute torture prohibited by the treaty. This definition is consistent with domestic law; indeed the US Supreme Court has characterized "solitary confinement" as one of the techniques of "physical and mental torture" that have been used by governments to coerce confessions. *Chambers v. Florida*, 309 U.S. 227, 237-38 (1940).

The treaty also requires that those who have been subjected to torture have a right to compensation; "Each State Party shall ensure in its legal system that the victim of an act of

9

torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible." CAT, Art. 14, sec. 1.

The Committee against Torture, the body of independent experts that monitors states parties' compliance with the CAT, most recently reviewed US compliance with the Convention in 2006. In its Conclusions and Recommendations, the Committee explicitly recognized that the PLRA's physical injury requirement contravenes Article 14 of the treaty, and called for its repeal:

The Committee is concerned by section 1997e(e) of the 1995 Prison Litigation Reform Act which provides "that no federal civil action may be brought by a prisoner for mental or emotional injury suffered while in custody without a prior showing of physical injury." (article 14).

(c). The PLRA's physical injury requirement is inconsistent with US obligations under the International Covenant on Civil and Political Rights

(1). The United States ratified the International Covenant on Civil and Political Rights (ICCPR) in 1992. The ICCPR specifically addresses the rights of prisoners:

1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation.

(2). ICCPR, Art. 10. The ICCPR also provides that a person whose rights guaranteed by the treaty have been violated must have access to an "effective remedy" for that violation:

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

10

*(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;*

*(c) To ensure that the competent authorities shall enforce such remedies when granted.*

(3).  ICCPR, Art. 2, sec. 3.-The Human Rights Committee, the expert body that monitors compliance with the ICCPR, last reviewed US compliance in 2006. The Committee expressed concern that conditions in some high-security US prisons – particularly the regimes of isolated confinement common to such prisons – may violate Art. 10:

(4).. The Committee reiterates its concern that conditions in some maximum security prisons are incompatible with the obligation contained in article 10 (1) of the Covenant to treat detainees with humanity and respect for the inherent dignity of the human person. It is particularly concerned by the practice in some such institutions to hold detainees in prolonged cellular confinement, and to allow them out-of-cell recreation for only five hours per week, in general conditions of strict regimentation in a depersonalized environment. It is also concerned that such treatment cannot be reconciled with the requirement in article 10 (3) that the penitentiary system shall comprise treatment the essential aim of which shall be the reformation and social rehabilitation of prisoners.

(5)  The State party should scrutinize conditions of detention in prisons, in particular in maximum security prisons, with a view to guaranteeing that persons deprived of their liberty be treated in accordance with the requirements of article 10 of the Covenant and the United Nations Standard Minimum Rules for the Treatment of Prisoners.

(6)  Concluding Observations of the Human Rights Committee, United States of America, CCPR/C/USA/CO/3/Rev. 1, 18 December 2006, ¶ 32 (emphasis in original).

11

*The PLRA's physical injury requirement bars a remedy for prisoners wrongfully subjected to isolated confinement, in violation of Art. 2, sec. 3 of the ICCPR. For example, in Pearson v. Welborn, 471 F.3d 732, 744-45 (7th Cir. 2006), a jury concluded that the prisoner had been wrongfully held in a "supermax" prison, in conditions of extreme isolation, for more than a year in retaliation for his complaints about prison conditions. Nevertheless, the Seventh Circuit held that under the PLRA's physical injury requirement, he could not recover any compensation. See also Royal v. Kautzky, 375 F.3d 720, 723-24 (8th Cir. 2004) (physical injury requirement barred compensation for prisoner wrongfully placed in segregation).*

(d).  The PLRA's physical injury requirement is inconsistent with US obligations under the International Convention on the Elimination of All Forms of Racial Discrimination

(1). (2)The International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) was ratified by the United States in 1994. This treaty requires the United States to "pursue by all appropriate means and without delay a policy of eliminating racial discrimination in all its forms" and to "ensure that all public authorities and public institutions, national and local," refrain from engaging in racial discrimination. ICERD, Art. 2, sec. 1(a).

The treaty also requires that persons who have suffered racial discrimination have the right to seek judicial remedies, including compensation:

States Parties shall assure to everyone within their jurisdiction effective protection and remedies, through the competent national tribunals and other State institutions, against any acts of racial discrimination which violate his human rights and fundamental freedoms contrary to this Convention, as well as the right to seek from such tribunals just and adequate reparation or satisfaction for any damage suffered as a result of such discrimination.

(e).  ICERD, Art. 6.

(1).  By denying compensation to a prisoner unless he or she has suffered a physical injury, the PLRA is inconsistent with US treaty obligations under ICERD. At least one federal

12

court has held that the physical injury requirement bars compensation for prisoners who allege that they have been subjected to racial discrimination by prison officials. See *Jones v. Pancake*, 2007 WL 2407271 (W.D. Ky., August 20, 2007).

**3.  Response to Defendants assertion that Plaintiff's conviction and/or sentence will be impacted by the outcome of the instant claim.**

    A.  Plaintiff's conviction was  a guilty plea in February 2012, in Lonoak County, Arkansas.

    B. Plaintiff received a proper colloquy prior to waiver of  extradition (stipulated facts.)

    C. Plaintiff had a probation revocation on 4/19/13 and was sentenced to 2yrs 6 months.

    D.  Plaintiff completed the sentence of incarceration and parole on 9/04/14

    E. The outcome of this matter will not impact Plaintiff's conviction or sentence. (exhibit 6)

**4. Plaintiff's response  to Defendants assertion that Plaintiff is unable to meet his burden of  showing Defendants violated his Eighth Amendments rights.**

    A.  The Defense relies on Farmer v. Brennan, 511 U.S. 825, 834 (1994) which applies to convicted persons.  The court felt that this standard aligned best with the text of the Eighth Amendment. Farmer established that "deliberate indifference" test for **convicted** prisoners claiming a § 1983 claim brought pursuant to the Eighth Amendment against an officers. (emphasis added)

    B. Plaintiff relies on the court's finding as it applies to pre-trial persons. In Wolfish, the Court analyzed the constitutionality of conditions of pretrial detention and focused on "whether those conditions amount[ed] to punishment of the detainee." The Court explained that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt." The Court clarified that, "a person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'"  The Court explained that "if a restriction or condition [of pretrial detention] is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees" (Bell v. Wolfish, 441 U.S. 520, 523 (1979).

13

C. Plaintiff asserts that his claims against Sylvia Melton's, a consequence of the City's failure to train, refusal to give Plaintiff access to the toilet for a total of twenty- five minutes and two request causing self-urination meets the meaning of arbitrary or purposeless under Bell. (the statement of stipulated facts only addresses Plaintiff's second request and not the total event as Plaintiff has continually described the event from original complaint through deposition) (Bell v. Wolfish, 441 U.S. 520, 523 (1979).

**5. Plaintiff's response to Defendants assertion that no policy or custom , employed by the City of Philadelphia was the proximate cause for Plaintiff's injury.**

A. Plaintiff asserts that the City of Philadelphia's failure to review and evaluate prison policies annually , as require by the State Rule of Criminal Procedure(Rule 119, exhibit 9) and Pennsylvania Code as promulgated by the Pennsylvania State Government and Supreme Court, resulted in a violation of Plaintiff's Constitutional rights guaranteed by the 5th, 6th and 14th Amendments

(1) § 95.224. Inmate rules and staff procedures.

' The following are the minimum requirements applicable to inmate rules and staff procedures: Written local policy must specify that inmate rules and staff procedures be reviewed by the prison administration on an annual basis. This review must determine if updates are necessary due to operational changes, changes in the law, constitutional standards or recognized professional standards. The annual review and updates shall be documented." Title 37 PA Code, section 95.224(6)

B. The custom of allowing correctional officers to deny incarcerated citizens access to toilet facilities at their , correctional officers, discretion, in non-emergency environments, violates prison policy 4.D.1 pg 3 and the 14th Amendment prohibition against the "punishment" of pre-trial detainees.

C. Fact that Sylvia Melton acted in a way that violated prison policy , constitutional rights and human rights is demonstrative of a failure to train on the part of the City of Philadelphia (Sylvia Melton deposition pg 13)(exhibit 7, 8)

**II.      Presence of Legally Suffcient Evidentiary Basis**

Pursuant to Federal Rule of Civil Procedure 11, the undersigned pro se defendant affirm that there is a legally sufficient evidentiary basis to support Plaintiff's claims against Defendants with respect to issues set forth above.

14

**Statement of Stipulated Facts**

1.  In 2010 Plaintiff was placed on probation following a conviction in the State of Arkansas. After being placed on probation in Arkansas, Plaintiff returned to Philadelphia, Pennsylvania.

2.  On November 29, 2012, Plaintiff was arrested for violation of his Arkansas probation. Plaintiff was incarcerated at Curran-Fromhold Correctional Facility while awaiting his extradition hearing in the City and County of Philadelphia, Pennsylvania.

3.  The Philadelphia Prison System follows Philadelphia Prison Policy Number 1.G.3 (2000) when conducting video conferencing between inmates and agencies and agents of the criminal justice system.

4.  On December 11, 2012, Plaintiff participated in a video conference extradition hearing. Plaintiff was taken to the video conference hearing room at Curran-Fromhold Correctional Facility where he was instructed by Correction Officer Lynch to speak to his attorney via telephone.

5.  Correction Officer Lynch instructed Plaintiff to only say "yes" to questions posited by his attorney during their telephone conversation.

6.  Plaintiff spoke to his attorney, via telephone, in a room with other inmates as well as Correction Officer Lynch.

7.  The telephone conversation with Plaintiff's attorney occurred before his video hearing was initiated with the assigned Judge.

8.  When the video conference began, Plaintiff was colloquied, on the record, regarding his decision to waive extradition.

9.  On December 11, 2012, Plaintiff was in the day room, locked out of his personal cell, at Curran-Fromhold Correctional Facility while participating in recreational time.

10. Plaintiff informed Correction Officer Sylvia Melton that he had to urinate and Plaintiff asked if Officer Melton would open his cell so that he could use the toilet.

11. Correction Officer Sylvia Melton did not open Plaintiff's cell immediately upon Plaintiff's request.

15

12. Plaintiff urinated himself.

13. Within five to ten minutes, Officer Melton conducted a tour and the cells were opened.

14. Upon entering his cell, Plaintiff changed his clothing.

**Relief Requested**

**Wherefore,** the Plaintiff respectfully request that this Court deny Defendants motion for summary judgment in the interest of justice and a matter of law.

U.S. Department of Justice
Office of Justice Programs



# Bureau of Justice Statistics
# Bulletin

August 1998, NCJ 170014

# Prisoners in 1997

By
Darrell K. Gilliard
and Allen J. Beck, Ph.D.
BJS Statisticians

The total number of prisoners under the jurisdiction of Federal or State adult correctional authorities was 1,244,554 at yearend 1997. During the year the States and the District of Columbia added 53,757 prisoners, and the Federal prison system added 7,429 prisoners. Overall, the Nation's prison population grew 5.2%, which was less than the average annual growth of 7.0% since 1990. In absolute numbers, prison growth during 1997 was equivalent to 1,177 more inmates per week, up from 1,106 per week in 1996.

At midyear 1997 (the latest available data), more than 1.7 million U.S. residents were in either jail or prison. State and Federal prisons housed two-thirds of the incarcerated population (1,158,763). Jails, which are locally operated and typically hold persons awaiting trial and those with sentences of a year or less, held the other third (567,079).

Relative to the number of U.S. residents, the rate of incarceration in prisons at yearend 1997 was 445 sentenced inmates per 100,000 residents — up from 292 in 1990. On December 31, 1997, 1 in every 117 men and 1 in every 1,852 women were sentenced prisoners under the jurisdiction of State or Federal correctional authorities.

## Highlights

| Decem- | Number of inmates | | Sentenced prisoners per 100,000 resident population | | Population housed as a percent of highest capacity | |
|---|---|---|---|---|---|---|
| ber 31 | Federal | State | Federal | State | Federal | State |
| 1990 | 65,526 | 708,393 | 20 | 272 | 151% | 115% |
| 1991 | 71,608 | 753,951 | 22 | 287 | 146 | 116 |
| 1992 | 80,259 | 802,241 | 26 | 305 | 137 | 118 |
| 1993 | 89,587 | 880,857 | 29 | 330 | 136 | 118 |
| 1994 | 95,034 | 959,668 | 30 | 356 | 125 | 117 |
| 1995 | 100,250 | 1,025,624 | 32 | 379 | 126 | 114 |
| 1996 | 105,544 | 1,077,824 | 33 | 394 | 125 | 116 |
| 1997 | 112,973 | 1,131,581 | 35 | 410 | 115 | 115 |

• During 1997 the number of female prisoners rose by 6.2%, slightly greater than the increase in male prisoners (5.2%). At yearend 1997 79,624 women were in State or Federal prisons — 6.4% of all prison inmates.

• On December 31, 1997, State prisons were operating at between 15% and 24% above capacity, while Federal prisons were operating at 19% above capacity.

• California (157,547), Texas (140,729), and the Federal system (112,973) together held 1 in every 3 prisoners in the Nation. Fifteen States, each holding fewer than 5,000 inmates, together held only 4% of the Nation's prisoners.

• Nine jurisdictions had increases of at least 10% in 1997, led by Hawaii (23.4%) and West Virginia (15.4%). Four jurisdictions, led by Oregon (down 7.6%) and Montana (-2.2%), experienced decreases.

• Analyses of imprisonment rates from 1990 to 1996, the year of the latest available data, reveal —

— a 43% increase among males and a 65% increase among females in the number of sentenced prisoners per 100,000 U.S. residents.

— sharp increases in rates among persons age 35–39 (up 66%), 40–44 (up 75%), and 45–54 (up 71%).

— widespread disparities by race and Hispanic origin. In 1996 the rate among black males totaled 3,098 prisoners per 100,000 residents, compared to 1,278 among Hispanic males and 370 among white males.

• Sources of population growth differed among State inmates:

— Violent offenders accounted for the largest source of growth among males (52%) and among whites (46%), blacks (50%), and Hispanics (54%).

— Drug offenders accounted for 30% of the growth among blacks, 23% among Hispanics, and 16% among whites.

— Only among females were drug offenders the largest source of growth (45% of the total increase).

**U.S. Department of Justice**
Office of Justice Programs

**Format revised 7/21/97**



## Bureau of Justice Statistics
# Bulletin

June 1997, NCJ 164619

# Prisoners in 1996

By Christopher J. Mumola
and Allen J. Beck, Ph.D.
BJS Statisticians

The total number of prisoners under the jurisdiction of Federal or State adult correctional authorities was 1,182,169 at yearend 1996. During the year the States and the District of Columbia added 50,582 prisoners, and the Federal prison system added 5,294 prisoners. Overall, the Nation's prison population grew by 5.0%, which was less than the average annual growth rate of 7.3% recorded since 1990. The 1996 increase was the equivalent of 1,075 more inmates per week.

At midyear 1996 (the latest available data), more than 1.6 million U.S. residents were incarcerated. State and Federal prisons housed about two-thirds of the incarcerated population (1,112,448). Jails, which are locally operated and typically hold persons awaiting trial and those with sentences of a year or less, held the other third (518,492).

Relative to the number of U.S. residents, the rate of incarceration in prisons at yearend 1996 totaled 427 sentenced inmates per 100,000 residents — up from 292 in 1990. On December 31, 1996, 1 in every 118 men and 1 in every 1,818 women were under the jurisdiction of State or Federal correctional authorities.

### Highlights

| Year | Number of inmates | | Sentenced prisoners per 100,000 resident population | | Population housed as a percent of highest capacity | |
|---|---|---|---|---|---|---|
| | Federal | State | Federal | State | Federal | State |
| 1985 | 40,223 | 462,284 | 14 | 187 | 123% | 105% |
| 1990 | 65,526 | 708,393 | 20 | 272 | 151 | 115 |
| 1991 | 71,608 | 753,951 | 22 | 287 | 146 | 116 |
| 1992 | 80,259 | 802,241 | 26 | 305 | 137 | 118 |
| 1993 | 89,587 | 880,857 | 29 | 330 | 136 | 118 |
| 1994 | 95,034 | 959,668 | 30 | 356 | 125 | 117 |
| 1995 | 100,250 | 1,026,043 | 32 | 379 | 126 | 114 |
| 1996 | 105,544 | 1,076,625 | 33 | 394 | 125 | 116 |

• During 1996 the number of female prisoners rose by 9.1%, nearly double the increase of male prisoners (4.7%). At yearend 74,730 women were in State or Federal prison — 6.3% of inmates.

• On December 31, 1996, State prisons were operating at between 16% and 24% above capacity, while Federal prisons were operating at 25% over capacity.

• California (147,712), Texas (132,383), and the Federal system (105,544) together held 1 in every 3 prisoners in the Nation. Fifteen States, each holding fewer than 5,000 inmates, together held only 3% of the Nation's prisoners.

• The prison population of 12 States grew by at least 10% in 1996, led by North Dakota (18.8%) and New Mexico (15.8%). Vermont (down 12.0%), the District of Columbia (-4.3%), and Florida (-0.2%) recorded declines.

• Factors underlying the growth in the State prison population between 1985 and 1995 include —
— a 12.3% average annual increase in the number of Hispanic inmates, higher than among blacks (9.4%) and whites (7.6%).
— a 91% rise in the number of admissions from 1985 to 1990 and a 13% rise from 1990 to 1995.
— a decline in annual release rates of prisoners from 37% in 1990 to 31% in 1995.
— a sharp rise in violent offenders among white inmates (accounting for 42% of the 10-year increase in white prisoners) and in drug offenders among black inmates (42% of their increase).
— an overall increase in the percentage held for drug offenses offset by declines in violent and property percentages.

Mr. DOLE. Mr. President, I am pleased to join today with my distinguished colleague from Arizona, Senator Kyl, in introducing the Prison Litigation Reform Act of 1995.

Over the past two decades, we have witnessed an alarming explosion in the number of lawsuits filed by State and Federal prisoners. According to enterprise institute scholar Walter Berns, the number of ``due-process and cruel and unusual punishment'' complaints filed by prisoners has grown astronomically--from 6,600 in 1975 to more than 39,000 in 1994. As Chief Justice William Rehnquist has pointed out, prisoners will now ``litigate at the drop of a hat,'' simply because they have little to lose and everything to gain. Prisoners have filed lawsuits claiming such grievances as insufficient storage locker space, being prohibited from attending a wedding anniversary party, and yes, being served creamy peanut butter instead of the chunky variety they had ordered.

Unfortunately, prisoner litigation does not operate in a vacuum. Frivolous lawsuits filed by prisoners tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law-abiding population.

According to Arizona Attorney General Grant Woods, 45 percent of the civil cases filed in Arizona's Federal courts last year were filed by State prisoners. That means that 20,000 prisoners in Arizona filed almost as many cases as Arizona's 3.5 million law-abiding citizens. The time and money spent defending most of these cases are clearly time and money that could be better spent prosecuting criminals, fighting [[Page S7525]] illegal drugs, or cracking down on consumer fraud.

# Section 1983 Lawsuits

**Section 1983 Lawsuits and State Prisoner Populations, 1972-1997**



Data Source: Administrative Office of the United States Courts.

In the 1960s, when the U.S. Supreme Court first established that prisoners had constitutional rights, there were few Section 1983 lawsuits filed in the U.S. District Courts.[7] The Administrative Office of the U.S. Courts reported only 218 cases nationally in 1966, the first year Section 1983 suits were recorded as a specific category of litigation. Beginning in the 1970s, federal court decisions expanded the scope of prisoner claims in several new areas including religious freedom to members of minority religions, adequate medical treatment, and access to law libraries.[8] The number of cases began to rise steadily and soon became linked closely to the number of prisoners.

As seen in the above graph, the number of Section 1983 lawsuits nationwide increased twelvefold from 1972 to 1996 (from 3,348 to 41,952 cases), while state prison population increased six times over the same time period (from 174,379 to 1,076,625). Efforts during the 1980s to limit the number of Section 1983 lawsuits by legislative and judicial policy (e.g., CRIPA) met with little success prior to 1996.[9]

As is the case with habeas corpus filings, the close correspondence between the number of state prisoners and the number of Section 1983 lawsuits is borne out by statistical analysis. While the data suggest that habeas corpus petitions were typically filed about six years after incarceration, the size of state prison populations was shown to have a more immediate impact on Section 1983 cases. The lack of a lag relationship between state prisoner population and the number of Section 1983 lawsuits suggests that many lawsuits are filed relatively soon after state prisoners are incarcerated, which is possible because there is no exhaustion requirement as in the case of habeas corpus petitions. Additional analysis indicates that between 1972 and 1997, every increase of 10,000 in the state prison population is associated with an increase of about 363 lawsuits filed.[10]  Given that the

U.S. Courts Judicial Facts and Figures, 2005
www.uscourts.gov/statistics

**Table 4.6**

**U.S. District Courts. Prisoner Petitions Filed by Nature of Suit**

| Fiscal Year | Grand Total | U.S. Cases | | | | | Private Cases | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Motions to Vacate Sentence | Habeas Corpus General* | Prison Conditions & Civil | Mandamus and Other | Total | Habeas Corpus General | Death Penalty | Prison Conditions & Civil | Mandamus and Other |
| 1990 | 43,209 | 7,103 | 3,087 | 2,333 | 1,130 | 553 | 36,106 | 10,656 | 79 | 25,030 | 341 |
| 1995 | 63,550 | 8,951 | 5,988 | 1,343 | 1,110 | 510 | 54,599 | 13,462 | 170 | 40,569 | 398 |
| 2000 | 58,257 | 11,880 | 6,341 | 3,870 | 1,041 | 628 | 46,377 | 21,090 | 259 | 24,464 | 564 |
| 2001 | 58,805 | 14,619 | 8,644 | 4,440 | 1,019 | 516 | 44,186 | 20,254 | 192 | 23,099 | 641 |
| 2002 | 55,292 | 12,190 | 6,107 | 4,483 | 1,046 | 554 | 43,102 | 19,390 | 225 | 22,918 | 569 |
| 2003 | 54,378 | 11,981 | 5,832 | 4,341 | 1,257 | 551 | 42,397 | 18,744 | 228 | 22,816 | 609 |
| 2004 | 55,330 | 13,908 | 7,137 | 4,923 | 1,334 | 514 | 41,422 | 18,432 | 214 | 22,115 | 661 |
| 2005 | 61,238 | 18,010 | 10,361 | 5,683 | 1,286 | 680 | 43,228 | 18,961 | 229 | 23,328 | 710 |

*Includes U.S. death penalty cases.

NOTE: Prisoner petitions increased 47 percent between 1990 and 1995. Since 1995, there have been fluctuations in prisoner petitions as a result of legislation (the Prison Litigation Reform Act and Title I of the Antiterrorism and Effective Death Penalty Act, both of which were passed in April 1996) and Supreme Court decisions (Bailey v. U.S. in 1995; Apprendi v. New Jersey in 2000; and U.S. v. Booker in 2005). The 45 percent increase in motions to vacate sentence in 2005

Source: Statistical Table C-3. Total prisoner petitions do not match exactly the data reported on the C-3 Table for 1990 because the data for this table were

**OTRR622 - 06**

**State of Arkansas**
**Parole Board**
**Parole Expiration**

**Date:** 04/26/2016
**Time:** 11:51 AM

## ORDER OF DISCHARGE

**RE:** Prillerman, Franklin Devon Jr          **ADC#:** 154786          **PID#:** 0236254

This is to certify that Prillerman, Franklin Devon Jr, ADC Number 154786 is hereby discharged from the Parole Board, Parole (TE), by reason of expiration of sentence.

Said Prillerman, Franklin Devon Jr, was committed to the Arkansas Department of Correction by the Circuit Court for the following:

| COUNTY | CRIME | COUNTS | DATE |
|--------|-------|--------|------|
| Lonoke | Man.Delv.Poss Cont Subs | 1 | 04/19/2013 |
|        | Probation Revocation |   |   |
| Lonoke | Fraud Etc Drug Paraphern. | 1 | 04/19/2013 |
|        | Probation Revocation |   |   |

TOTAL SENTENCE LENGTH: 2y 6m 0d          MINIMUM RELEASE DATE: 09/04/2014

**DISCHARGE**

BY _____

WARDEN/SUPERVISOR _____



| PHILADELPHIA PRISONS<br><br>POLICIES & PROCEDURES | Policy Number:<br><br>4.D.1 | Page 3<br><br>of 3 |
|---|---|---|

| **Part:** IV - Institutional Services | **Subject:** Inmate Hygiene |
|---|---|
| **Section:** D - Sanitation and Hygiene | **Date:** January 11, 2012 |

*Available Toilet Facilities*
Inmates will be provided twenty-four hour access to a working toilet and a hand-washing sink with hot and cold running water.

Each toilet will be raised off the floor, and those in cells will be capable of being flushed from the interior of the cell. Toilet fixtures and showers will be of sanitary design, easy to clean, and kept clean and free of objectionable odors.

*Hair Care*
Hair care services for inmates in both general population and special management housing units will comply with applicable health requirements.

Barbering services will be provided by an individual skilled in hair cutting. Each facility will develop a schedule of such services, which will be posted in prominent locations throughout the housing areas.

Q     Let me ask you.  When we were talking about access to the bathroom in between tours you said, and correct me if I'm wrong or if I misquote you, that it depends on the staff person whether they open the door for you or not?

A     (Witness indicating.)

Q     Would you open the door when people asked you to go to the bathroom during the tour -- I mean in between tours?

A     It depends.

Q     Meaning sometimes you would and sometimes you wouldn't?

A     Yes.

MR. PRILLERMAN:  It would depend.  Okay.
I'm good.  I have no further questions at this time.

                    *  *  *

            (Witness excused.)

                    *  *  *

     (Whereupon, the deposition concluded
    at 11:05 a.m.)

                    *  *  *

36215b89-ed2e-4f24-aeeb-6873234e3c5d

## Rule 119. Use of Two–Way Simultaneous Audio-Visual Communication in Criminal Proceedings.

(A)  The court or issuing authority may use two-way simultaneous audio-visual communication at any criminal proceeding except:

(1)  preliminary hearings;

(2)  proceedings pursuant to Rule 569(A)(2)(b);

(3)  proceedings pursuant to Rules 595 and 597;

(4)  trials;

(5)  sentencing hearings;

(6)  parole, probation, and intermediate punishment revocation hearings; and

(7)  any proceeding in which the defendant has a constitutional or statutory right to be physically present.

(B)  The defendant may consent to any proceeding being conducted using two-way simultaneous audio-visual communication.

(C)  When counsel for the defendant is present, the defendant must be permitted to communicate fully and confidentially with defense counsel immediately prior to and during the proceeding.

### Comment

This rule was adopted in 2003 to make it clear that unless the case comes within one of the exceptions in paragraph (A), the court or issuing authority may use two-way simultaneous audio-visual communication in any criminal proceeding. Two-way simultaneous audio-visual communication is a type of advanced communication technology as defined in Rule 103.

Nothing in this rule is intended to limit any right of a defendant to waive his or her presence at a criminal proceeding in the same manner as the defendant may waive other rights. *See, e.g.*, Rule 602 Comment. Negotiated guilty pleas when the defendant has agreed to the sentence, probation revocation hearings, and hearings held pursuant to Rule 908(C) and the Post Conviction Relief Act, 42 Pa.C.S. § § 9541 et seq., are examples of hearings in which the defendant's consent to proceed using two-way simultaneous audio-visual communication would be required. Hearings on post-sentence motions, bail hearings, bench warrant hearings, extradition hearings, and *Gagnon* I hearings are examples of proceedings that may be conducted using two-way simultaneous audio-

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

      Plaintiff

      v.

CITY OF PHILADELPHIA, ET AL..,

      Defendant

CIVIL ACTION NO.

13-1414

JURY TRIAL DEMANDED



FILED
MAY - 6 2016
MICHAEL E. KUNZ, Clerk
C. _____ Dep. Clerk

**CERTIFICATE OF SERVICE**

I, Franklyn Prillerman, do hereby certify that on this date a correct copy of Plaintiff's Response Defendants Motion for Summary Judgment was sent via first class mail to:

Kristen Davis
City of Philadelphia Law Department
Civil Rights Unit
\1515 Arch St, 14th fl
Philadelphia, PA 19102

Date: February 22, 2016

Respectfully submitted,

/s/ Franklyn D. Prillerman
123 E. Pomona St.
Philadelphia, PA 19144