IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

    Plaintiff

v.

CITY OF PHILADELPHIA, ET AL..,

    Defendant

CIVIL ACTION NO.

13-1414

JURY TRIAL DEMANDED

### ORDER

And now, this _____ day of _____,2018, upon consideration Defendants', City of Philadelphia and Tanya Lynch, Motion for Summary Judgment, and Plaintiff's response thereto, it is hereby **ORDERED AND DECREED** that Defendants' Motion for Summary Judgment is **DENIED** and the matter will proceed to trial.

BY THE COURT:

_____

Rufe, J

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

      Plaintiff                          CIVIL ACTION NO.

      v.                                 13-1414

CITY OF PHILADELPHIA, ET AL..,      JURY TRIAL DEMANDED       MAR 19 2018

      Defendant

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

Plaintiff, Franklyn Prillerman, pro se, hereby file this Response to Defendants' Motion for Summary Judgement pursuant Federal Rules of Civil Procedure and this Honorable Court's Policies and Procedures.

    **I.**      **Issues and Subissues**

        Plaintiff's response to Defendants' Issue 1. - *No reasonable jury could find that Plaintiff has met his burdened of showing that Defendants violated his Fourteenth Amendment Due Process rights. To bring a procedure due process claim, a litigant must alleged facts which plausibly suggest "that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property, and (2) the procedures available to him did not provide due process of law.*

First, Defendant's Counsel has abridged Plaintiff's claim. Plaintiff's claim has consistently been that the actions of the Defendants denied him equal protection under the law and due process as guaranteed by the 14th Amendment. Opposing counsel has chosen not to address the denial of "equal protection under the law" aspect of Plaintiffs 14th Amendment claim, presumably conceding that point. However, Plaintiff represents the following:

1. On December 11, 2012 Franklyn Prillerman was present at a two-way simultaneous audio/visual communication Extradition hearing held at the Curran-Fromhold Correctional facility hearing room.

2. Tanya Lynch was the hearing room officer on December 11, 2012

3. Prison Policy 1.G.3 signed May 11, 2000 was the policy governing hearings in room 888 (hearing room) on December 11, 2012. Said policy was outdated at the time of Plaintiff's hearing and not compliant with existing PA Rules for Criminal Procedure.

4. Prison Policy 1.G.3 (2000) was not in compliance with the Pennsylvania Rules of Criminal Procedure; Title 234 Rule 118(C) (later renumbered as 119) on December 11, 2012.

5. Prison Policy 1.G.3 had been out of compliance with Title 234 Rule 118/119 since 2003 as of December 11, 2012 nine years (9 years).

6. Pennsylvania Code 37 section 95.224 mandates an annual review of all county prison policies to insure compliance with federal and state laws.

7. Title 234 Rule 119(C) mandates full and confidential communication between defendant and his attorney just prior to and during two-way simultaneous audio-visual communication in a criminal proceeding. Plaintiff was denied full and confidential communication with his attorney just prior to the video hearing, contrary to the law.

8. The prison administration was well aware of the 6th Amendment constitutional requirement for "privileged communication" between client and attorney as demonstrated by the special accommodations made for "attorney visits" and the distribution of "legal mail". See Title 37 sections 95.234 and section 95.233

9. Plaintiff was not afforded privileged communication with attorney at the extradition hearing on 12/11/12 according to Tanya Lynch's, the hearing room officer on 12/11/12, sworn testimony during deposition. (Lynch deposition of 1/21/16)

10. As of the date of Tanya Lynch's deposition, 1/21/16, she has acted as the hearing room officer for nine (9) years.

11. The Philadelphia Prison System revised policy 1.G.3 on January 9, 2015, to be in compliance with Title 234 119 (c). Policy effective date stated as February 9, 2015.

12. As of January 28, 2016 Tanya Lynch, hearing room officer, testified that she was not aware of, nor had she received training with regard to the updated policy. She also testified that the hearing room itself is structured and configured in the same way it was in 2012 (deposition of 1/21/16)

13. The procedures available to Plaintiff by the Defendants deprived plaintiff of equal protection and due process under the law in that PA Criminal Procedures mandate free and confidential communications with attorney just prior to a video hearing were denied Plaintiff.

14. Plaintiff complained to C.O. Lynch at the time and upon her refusal to comply with the law Plaintiff filed a formal grievance.

15. As a result of the actions by Defendants, Plaintiff was denied equal protection under the law and denied due process in violation of the 14th Amendment of the U. S. Constitution. This has been Plaintiff's persistent complaint. Denial of equal protection under the law in that the state law mandating free and confidential communications with my attorney was not afforded Plaintiff. Moreover, Plaintiff was denied due process of law adversely affecting Plaintiff's life and liberty. Plaintiff was subsequently extradited to Arkansas. Where upon review the Arkansas Appellate Court found that there was no merit to the County Attorney's motion or subsequent hearing to revoke Plaintiff's probation (2014 Ark App 46, Arkansas Court of Appeals II, No. CR-13-647). At the time of the extradition hearing Plaintiff was aware of the existence of exculpatory evidence which he was not allowed to communicate to his attorney in an unfettered and confidential manner. Had Plaintiff had free and confidential communications with his attorney at the time of the extradition hearing the matter likely would have been resolved without further adversely impacting Plaintiff's life and liberty.


Response to Defendants' issue #2- *Qualified immunity bars Plaintiff from suing the individual Defendant. Qualified immunity shields officers from liability, unless it is "beyond debate" that the federal right they allegedly violated was "clearly established at the time of the alleged conduct" .A right only qualifies as clearly established if its "contours...are sufficiently clear that every reasonable official would have understood that what he is doing violates the that right.*

The prison administration was well aware of the 6th Amendment constitutional requirement for "privileged communication" between client and attorney as demonstrated by the special accommodations made for "attorney visits" and the distribution of "legal mail". See Title 37 sections 95.234 and section 95.233   Privileged communication between client and lawyer is common knowledge among prison administrators and custodial personnel as demonstrated daily in the supervision and/or observation of " attorney visits" and the distribution of "legal mail". It is unreasonable to believe that C.O. Lynch in her nine plus years of service would be unaware of such, or had never supervised or

which had been law for nine (9) years was "clearly established at the time of the challenged conduct. As regards the Defendant, City of Philadelphia, Defendant had an obligation to review and update prison policies to insure their compliance with both s the state and federal laws. Their obvious failure to do so resulted in the events generating this complaint.

Response to Defendants' issue #3- *Plaintiff failed to file a grievance and thus never exhausted his administrative remedies as required by the PLRA.*

First, Plaintiff did file a formal grievance prior to filing this complaint, a copy of which was included in the initial complaint filed in the matter as an exhibit. Second, Plaintiff was transferred from the facility on the day the grievance was filed. Third, the prison never responded to the grievance once Plaintiff was transferred. Therefore, no further administrative action was possible, ergo all administrative options were exhausted. Moreover, all Philadelphia prison policies are contained in the "prisoner handbook" which must be returned to the facility once released, all other policies are only posted on cell blocks. Consequently, there is no access to PPS policies and procedures once one leaves the facility for another jail. Moreover, Plaintiff believes that the grievance he file in this matter was never processed by PPS because C.O. Lynch was never given a copy of the grievance as PPS policy requires (see Lynch deposition of 1/21/16 pg.18, )

See *Taylor v. Barrett 105 Supp 2d 483*. The PLRA requires exhaustion only of those administrative remedies "as are available," the PLRA does not require exhaustion when circumstances render administrative remedies "effectively unavailable" *Nunez, 591 F.3d at 1223-26 (holding that Nunez's failure to timely exhaust his administrative remedies was excused because he took reasonable and appropriate steps to exhaust claims and was precluded from exhausting not through his own fault but by the warden's mistake) Sapp, 623 F.3d at 822-23*

Moreover, Plaintiff asserts that the PLRA is unconstitutional in that it represents legislative overreach and a violation of the separations of powers requirement of the U.S. Constitution.

      A. The Plaintiff asserts The Prisoner Litigation Reform Act in general and section 1997(e) specifically, violates Article III, section 1; Article VI, clause 2, the 14th Amendment, section 5, the Supremacy Clause and the Equal Protection and Due Process protections of the United States Constitution. Plaintiff offers in support the following:

(1) The government's own actions created the circumstances complained of (the overburdening of the Federal Courts) to be remedied by The Prisoner Litigation Reform Act.

(a) From 1980 - 1994, Congress has been extending federal jurisdiction over crime control to areas once considered to be within state and local jurisdiction (e. g., juvenile justice and gun control), and enlarging federal support of state and local efforts to combat crime. It passed three omnibus crime control bills since 1984. The Comprehensive Crime Control Act of 1984 (P. L. 98-473) overhauled the federal sentencing system and revised bail and forfeiture procedures along with other federal practices. The Crime Control Act of 1990 (P. L. 101-647) codified a Crime Victims' Bill of Rights in the federal justice system and directed the U. S. Sentencing Commission to amend certain sentencing guidelines. The Violent Crime Control and Law Enforcement Act of 1994 (P. L. 103-322) authorized funding for law enforcement and crime prevention measures including increasing the number of crimes punishable by death and establishing a "three-strikes" provision for violent offenders (JoAnne O'Bryan and Lisa Seghetti, Congressional Research Service   Policy Almanac
http://www.policyalmanac.org/crime/archive/crs_federal_crime_policy.shtml
Updated September 12, 2002)

(b). Relative to the number of U.S. residents, the rate of incarceration in prisons at year end 1996 totaled 427 sentenced inmates per 100,000 residents –up from 292 in 1990. (Bureau of Justice Statistics Bulletin, June 1997, NCJ 164619, page 1) (exhibit 1)

(c). Factors underlying the growth in the State prison population between 1985 and 1995 include a 91% rise in the number of admissions from 1985 to 1990 and a 13% rise in admissions from 1990-1995. . (Bureau of Justice Statistics Bulletin, Highlights, June 1996, NCJ 164619, page 1) (exhibit 2)

(d) The increased incarcerations rates from 1985-1996 exacerbated overcrowding in State prison from 5% over highest housing capacity in 1985 to 16% over capacity in 1996. . (Bureau of Justice Statistics Bulletin, Highlights, June 1997, NCJ 164619, page 1) (exhibit 1)

(e). The crime bills cited above,1(a), as designed and intended, led to hyper growth of the federal, state and county prison populations, thereby stressing the infrastructure (physical plant and services) of said institutions.  An expected consequence of these stresses was prison overcrowding, the inability to deliver adequate timely medical services, rehabilitation services, mental health services and provide and sanitary environment and other constitutional required services. Consequently, leading to increased (sic) section 1983 filings and court ordered consent decrees to remedy constitutional

violations, which placed economic burdens on federal, state and local governments. (In example: See, e.g., Rhodes v. Chapman, 452 U.S. 337, 339 (1981) (alleging that the housing of two prisoners in a single cell is cruel and unusual punishment); Nami v. Fauver, 82 F.3d 63, 65-66 (3d Cir. 1996) (alleging that the housing of two inmates in single cell, together with inadequate medical care, recreation, access to bathrooms, and rehabilitation programs, violates the Constitution); Ingalls v. Florio, 968 F. Supp. 193, 197 (D.N.J. 1997) (alleging that insufficient housing space, together with inadequate sanitation, recreation, and food, violates the Eighth Amendment).

(2) The government's assertion that the Federal Courts were overburdened by frivolous 1983 litigation by prisoners is unsubstantiated by the quantitative and qualitative evidence established and provided by the Federal Courts and the Department of Justice.

(a). In introducing the PLRA Senator Dole stated, "According to the enterprise institute scholar, Walter Berns, the number of due process and cruel and unusual punishment complaints filed by prisoners has grown astronomically—from 6,000 in 1975 to 39000 in 1994." (141 Congressional Record S7524-7525, May 25, 1995) (exhibit 3)

(b) In 1975 state prisoners did not have a right to access to law libraries. State prisoners were granted access to law libraries until 1977 (Bounds v. Smith U.S. 817(1977). So, with access to law libraries, reasonably 1983 law suits by state prisoners increased, which was the inherent purpose of the law to provide access to remedy to prisoners through the courts. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts.(exhibit 4)

(c). In introducing the Bill that would become the PLRA Sen Dole cited the astronomical growth of section 1983 filings by state prisoners. Sen Dole's assertion was not supported by the statistical data available at the time, 2.7% of state prisoners filed section 1983 claims in 1974 compared to 3.7% of state prisoners filing section 1983 claims in 1994, an increase of 1%. Over the same period 1974-1996 the state prison population grew 350%. Therefore, it is reasonable to attribute the 1% state prisoner population per capita growth to the 350% growth in the population of state prisoners. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts. (exhibit 4)

(d). Civil case filings in the U.S. district courts increased from 236,400to 248,300, a 5 percent increase. This rise resulted mostly from increases in private cases involving federal question litigation. Federal question litigation rose 13 percent, primarily due to personal injury product liability cases which nearly doubled. This sizeable increase was due to breast implant cases which were removed from state to federal courts following the bankruptcy of Dow Corning. Other areas of federal question litigation that increased were civil rights filings which rose 13 percent and prisoner petitions which rose 9 percent. In contrast, diversity of citizens cases declined 6 percent, mostly as a result of a 30 percent drop in personal injury/product liability cases. Cases involving the U.S. Government as plaintiff or defendant dropped 5 percent, as a result of decreases in cases brought by the U.S. government to recover on defaulted student loans (down 13 percent) and overpayment of veteran's benefits (down 62 percent). (1995 Year End Judiciary Report, page 3, paragraph IIA (1), Chief Justice William Rehnquist.

(e) Though Chief Justice Rehnquist cites a 9% increase in prisoner petitions, he does not cite the increase as a problem. Furthermore, the Chief Justice does not separate out Habeus Corpus petitions or Writs of Mandamus from section 1983 petitions.

(f). A thorough examination of, "REPORT OF THE PROCEEDINGS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES" years 1990-1996 finds no mention of prisoner 1983 filings as a burden to the federal courts. However, the courts opposition to mandatory sentencing is cited in the September 1991 report, again in the March 1993 report and yet again in the September 1994 report. (http://www.uscourts.gov/about-federal-courts/reports-proceedings-1990)

(g) The "injury" asserted by the government, the overburdening of the federal courts, is not borne out in the federal judicial statistics and reports.

(h). Though the stated goal of the PLRA was to prevent the overburdening of the Federal Courts with frivolous prisoner lawsuits brought under Title 42 section 1983 (The actual number of frivolous 1983 law suits filed is not included in the Congressional record, only the total number of Title 42 section 1983 lawsuits, meritorious and frivolous).

(i). At the time of the passing of the PLRA the incarcerated citizen per capita 1983 filing rate was approximately the same as it was in 1974. (as represented by the gap between the state prison population growth line and the section 1983 lawsuits line in the graph depicted on page 4 of the cited material) The actual number of filings was higher due to the increase in the actual number of people incarcerated in state prison which had grown from about 200,000 to over I million. (Caseload Highlights,

Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts (exhibit 4)

(j) Plaintiff asserts that the government's politically motivated rhetoric is insufficient to establish an "injury" unsupported by facts.  Furthermore, in the absent of an actual injury, a "legislative remedy" which abridges the constitutional rights of citizens is injurious in and of itself.  The needed remedy is intervention by the court where the government lacks the political will to do what is right.

(3) The government's purpose in enacting the Prisoner Litigation Act was to curtail Federal Courts intervention by "consent decree", for upholding the Constitutional rights of incarcerated citizens, into the Administration of State and Federal prisons, often resulting in Federal and State governments to spending more than they found reasonable on prisons.

(a). Senator Dole further asserted, "Unfortunately, prisoner litigation does not operate in a vacuum.  Frivolous lawsuits filed by prisoners tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law-abiding population."  In this statement Sen Dole seems to presume that all prisoner litigation is frivolous, in that he provides no data as to the number of frivolous or non- frivolous law suits.  Sen Dole referencing the PLRA, "This Amendment will help put an end to the inmate litigation fun-and- games- Senator Dole, during Senate debate on an early version of the PRLA, September 29, 1995. Senator Dole's statements give support to the premise that the 'personal injury' requirement of the PLRA was politically motivated to reduce meaningful section 1983 filings and subsequently reduce Federal Court intervention into state prisons, as opposed to being determined by available data.

(b). On April 26, 1996, the PLRA became law. Section 802(a) of the act, codified as 18 U.S.C. § 3626, allows for the immediate termination of prospective relief in existing settlements involving prison conditions, and limits any future prospective relief to the constitutional minimum.

(c). The PLRA severely restricts a prisoner's ability to seek remedy for constitutional violations in the courts via section 1983 filings, the historical and exclusive pathway to federal court protection from abuse of incarcerated citizens by the government, thereby severely limiting federal court intervention by consent decree by abridgement of the constitutional rights of incarcerated citizens. The PRLA was used

by the Congress to circumvent Article III section 1 of the U.S. Constitution, (***Article III, Section. 1*** *The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.*) on the backs of prisoners, a group comprised of primarily the impoverished and the uneducated citizenry.

(d) Since the passage of the PLRA all consent decrees legitimately in place in 1996 became null and void and the prospect of new consent decrees by the court has become highly unlikely, given the precipitous decline in section 1983 filings beginning in 1997. (Caseload Highlights, Volume 4 Number 2, National Center for State Courts, pp4, Section 1983 Lawsuits and State Prison Populations, 1972-1997, Ostrom, Cheesman, Hanson and Kauder (1998)). Data source: Administrative Office of the United States Courts. (exhibit 4)

(e) In the period from 1995 to 2000 section 1983 filings declined 60 percent and remained at the reduced level from 2000-2005. (U.S. Courts-Business of the Courts, Judicial Facts and Figures, 2005. www.uscourts.gov/statistics) (exhibit 5)

(f). The 60 percent decline in section 1983 filings is demonstrative of chilling effect of the PLRA on incarcerated citizens seeking redress through the courts for violations of their constitutional rights. Such a decline in filings warrants an examination by the courts through the filter of the U.S. Constitution and the interest of justice.

(4) The personal injury requirement of the PLRA does not meet the Constitutional requirements for "congruence and proportionality of the means adopted and the injury to be remedied.

(a). The 60 percent decline in section 1983 filings from 1995-2000, is demonstrative of chilling effect of the PLRA on incarcerated citizens seeking redress through the courts for violations of their constitutional rights. Such a decline in filings warrants an extra look by the courts. (U.S. Courts-Business of the Courts, Judicial Facts and Figures, 2005. www.uscourts.gov/statistics) (exhibit 5)

*If the effect of the PLRA were to selectively discourage the filings of frivolous or meritless lawsuits, as its sponsors predicted, then we should expect to find prisoners winning a larger percentage of their lawsuits after the law's enactment than we did before. But the most comprehensive study to date shows just the opposite: since passage of the PLRA, prisoners not only are filing fewer law suits, but are also succeeding in a smaller proportion of the cases they do file. This strongly suggest that rather*

*than filtering out meritless lawsuits, the PLRA has simply tilted the playing field against prisoners across the board. The author of a comprehensive study on the impact of the act concludes, "the PLRA 's new decision standards have imposed new and very high hurdles so that even constitutionally meritorious cases are often thrown out of court"*

(Congressional statement by David Fathi, US Director, Human Rights Watch,) ( http://hrw.org/english/docs/2007/11/07/usdom17277.htm)

(b) The personal injury requirement devalues the constitutional rights of incarcerated citizens to nothing. Plaintiff asserts if one's constitutional rights have no value , absent physical injury, to the government, then defacto that citizen has no constitutional rights. This assertion reflected in the many dismissals of meritorious claims of violations of citizens constitutional rights by the courts.

(c). The courts have recognized there are some constitutional rights that are so fundamental to being an United States citizen and the spirit of America, that the "personal injury" requirement of the PLRA does not apply.

(d). The court found that while the PLRA's purpose was to curtail litigation options available to prisoners, its purpose was not to insulate from review all claims in which legitimate constitutional claims predominate without accompanying physical harm, citing 28 USC § 1915(g). In so holding, the court followed Cannell v. Lightner , 143 F.3d 1210, 1213 (9th Cir. 1998) (First Amendment rights upheld absent physical injury); Williams v. Otis , 230 F.3d 1361 (6th Cir. 2000) (PLRA does not cover First Amendment retaliation claim); and Rowe v. Shake , 196 F.3d 778, 781 (7th Cir. 1999) (First Amendment claims require no injury showing).

Rowe v. Shake (citation above)

Mr. Rowe and Dr. Lant challenge the district court's decision to dismiss Mr. Rowe's claims because he did not allege the requirements of § 1997e(e). The section provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Although the applicability of § 1997e(e) to a prisoner's First Amendment claim presents an issue of first impression in this circuit, we have previously addressed the scope of the statute. See Robinson v. Page, 170 F.3d 747(7th Cir. 1999). In Robinson, we stated, "It would be a serious mistake to interpret section 1997e(e) to require a showing of physical injury in all prisoner civil rights suits." Id. at

748. We further observed that § 1997e(e) applies only to claims for mental or emotional injury. Id. Claims for other types of injury do not implicate the statute. Id. Here, Rowe alleges that prison officials P

The personal injury requirements of the PLRA usurps the finality of Judicial Review, thereby violating the separation of powers requirement of the U.S. Constitution.

## II.  **REPRESENTANTION TO THE COURT**

Pursuant to Federal Rule of Civil Procedure 11, the undersigned pro se Plaintiff affirms that his claim is in full compliance with FRCP 11(b).

## III.  **Statement of Facts**

1. In 2010, Plaintiff was placed on probation following a conviction in the State of Arkansas, Plaintiff returned to Philadelphia, Pennsylvania
2. On November 29, 2012, Plaintiff was arrested for violation of the Arkansas probation. Plaintiff was incarcerated at the Curran-Fromhold Correctional facility, while awaiting extradition hearing in the city and county of Philadelphia.
3. The Philadelphia Prison system followed Philadelphia Prison policy 1.G.3 (2000) when conducting video conferencing for extradition hearings.
4. Philadelphia Prison Policy 1.G.3 (2000) was out of compliance with Pennsylvania Rules of Criminal Procedure 119/118 enacted in 2003, governing video hearings on 12/11/2012.
5. On December 11, 2012, Plaintiff participated in a video conference extradition hearing. Plaintiff was taken to the video conference hearing room at Curran-Fromhold where he was instructed by C.O. Lynch to speak to his attorney via telephone.
6. Correction Ofc. Lynch instructed Plaintiff to only say "yes" to questions posited by his lawyer and not to discuss his case.
7. Plaintiff spoke to his lawyer, via telephone in a room with other persons and C.O. Lynch.
8. The telephone conversation with Plaintiff's attorney occurred before his video hearing initiated with the assigned Judge.
9. When the video conference began, Plaintiff was colloquied, on the record, regarding to his decision to waive extradition.

IV. **Relief Requested**

Wherefore, the Plaintiff respectfully request that this Court deny Defendants' Motion for Summary Judgement as a matter of Law.

Respectfully submitted

/s/ _____  Date 3/16/15

Franklyn Prillerman

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANKLYN DEVON PRILLERMAN

    Plaintiff

v.

CITY OF PHILADELPHIA, ET AL..,

    Defendant

CIVIL ACTION NO.

13-1414

JURY TRIAL DEMANDED



FILED
MAR 19 2018

## PROOF OF SERVICE

And now, this 16th day of March, 2018, Plaintiff served Defendants with his Response to Defendants', City of Philadelphia and Tanya Lynch, Motion for Summary Judgment. Defendants were Served via first class U.S. Mail at:

Tara Fung

Civil Rights Unit

14th floor

1515 Arch St.

Philadelphia, PA 19102

_____
Frank Prillerman, Pro se